The Chancellor.
The first rjuestionT shall c'onsider is, whether the bond and mortgage are the acts of the company.Were they so executed as to bind the' company ?
The third section of the act of incorporation provides, that1 the stock, property and concerns of the company shall be man - aged and conducted by five directors, being stockholders, one' of whom shall be president/and that the president and directors may make and ordain such by-laws and regulations fortifier government of the Corporation, and for the management of the' stock, property, effects and concerns of the company, as may by them be deemed necessary and convenient-'; and that the" president and directors, or a majority of them, shall and may appoint such officers, superintendents and agents, as they may think proper, and may remove the same at their pleasure.
The fourth section provides, that the said prfesident and dircc ■- tors, or a majority of them, shall have power" to call in stocfc* from time to time, in such installments as they shall see fit to’ prescribe; and by the last clause'of the eighth section it is pro-’ vided, that on the death or resignation of any director, the re- • maining directors shall choose from among the stockholders some fit person to fill the vacancy, who shall hold his office til/' the next annual meeting.
Under this act,-What is the mode of expressing the binding' will of the corporation? If, on' due notice to all the directors’, three only meet, can a majority of them bind the corporation?' It is said in 2 Kent’s Com. 293, that there is a distinction taken' between a corporate act to be done by a select and definite body, and one to-be performed by the constituent members. In1 *168 the latter case, a‘ majority of those who appear may act; but in the former, a majority of the definite body must be present, and then a majority of the quorum may decide.' This, the author says, is the general rule on the subject / arid if any corporation has a different mode of expressing its binding will, it arises from the specific provisions óf the act of incorporation/
The act incorporating this company does not give, specially/ any definite mode of expressing the will of the corporation. It does not say, in words,' that the concurrence of three of the five directors shall be necessary to bind the corporation; nor' that three shall be a quorum. The provisions in this respect differ, in words; in different parts of the act. In two clauses, the words, “ or a majority of them,” occur. These clauses authorize the president and directors, or a majority of them, to appoint officers, and to call in installments. Is it intended that when three are duly met, two of them may make'the appointments, and call in installments ?'—or is the concurrence of three of the'five necessary ? I have great difficulty in supposing, that the legislature; when' they say that a majority of the five may' appoint officers- and call in installments, intended that two of the five might do it, if a third should be present1, though he' should vote against it. If in these clauses this was not- intended, was it intended to give a different rule in the other clauses ? The act of a majority of those who, by the charter, have a voice in the corporate deliberations, will bind.- The question is, what shall be considered the act of that majority? Mr. Kyd says, that in different corporations, the manner in which the majority shall be reckoned varies according to the provisions of the charter. Sometimes; the act that is to bind must be sanctioned by the assent of an absolute majority of the body empowered to act; sometimes, it is sufficient if a majority of the body be assembled, and the majority of those assembled agree to the act: Kyd, 309.
Which of these rules does this act give ? or does it give different rules for different purposes ? Does it require the concurrence of three voices to appoint an agent, and of only two to make a deed ? Lawrence, justice, in Witherell v. Gartham, 6 T. R. 592, says, “ In general, it would be the understanding of a plain man, that when a body of persons is to do an act, a *169 majority of that body would bind the rest.” A think a plain man would quite as readily understand, that a minority of the body could not, under any circumstances.
Without deciding what is the construction of the act in this respect, (for I have disposed of the cause on' other grounds,) I am willing to say, that the experience of New-Jersey in reference to the proceedings of corporations, furnishes strong arguments to her judicial tribunals, to induce them to look narrowly into the powers given by acts of incorporation. But, under both these clauses, not less than three can constitute a board to do a corporate act. Could Stebbins, with two other directors, constitute a hoard to Vote a mortgage from the company to him ? I think not. A member of a corporation contracting with it, is regarded, as to that contract, as a stranger: Ang. and Ames, 168, 169; 1 Kyd on Corporations, 180.
This brings us to an inquiry of fact in the case. Were there three directors other than Stebbins present, duly assembled, at the meeting or meetings at which the acts necessary to hind the company by this bond and mortgage to him, were done ? It is shown by the testimony 0f Brown and Packer, that at the meeting of the 10th of January, 1842, but three of the directors were present, and Stebbins was one of them. This fact is uncontradicted, unless the minutes are sufficient to overcome this direct testimony, and to show that four of the directors were then present. “ The books and minutes of a corporation, if there is nothing to ráise a suspicion that the corporate proceedings have been irregular, will be treated and referred to as evidence of the legality of the proceedingsAngel and Ames, 407. How'ever regular and free from suspicion on the face of them, they would be but prima facie evidence. I have examined the minutes carefully. The appearance of them is too suspicious to allow them to overcome the testimony of Brown and Packer* It is plain, that at the meeting of the 10th of January, there were but two directors present besides Stebbins. As to the word “ board,” as used by the witnesses, it is evident they use it without regard to the question whether a meeting of three directors, including Stebbins, would be a competent board to give a mortgage to him.
The meeting of Gaston, Packer and Stebbins, on the 10th *170 of January, the minutes of which say that a resolution was then passed, ordering the president to sign the bond and mortgage and affix thereto his own seal, which was thereby" acknowledged and adopted as the seal of the company for- that purpose, was not- a legal board for the purpose of giving- a mortgage to Stebbins: But the affixing the seal of a corporation is a ministerial act, and may be done by a less number than is necessary to constitute s board, if it be done by the direction of a legal board: Angel and Ames, 155; 158, 406. Was there any previous meeting of a legal board for giving a mortgage to Stebbins, at which' the1 affixing the seal to the bond'and mortgage was directed to be done' ? The minutes, as they now appear, show, under a heading of a meeting on the 5th of January, 1842, which states that Gaston; Stebbins, Yan Renselaer and Packer were present, and prior to the heading of the meeting of the 10th, two entries, one directing the president to execute the bond and mortgage and affix thereto a common seal, and the other, stating, that that meeting was then adjourned to the office of George H. Brown, esquire,. January 10th, at 5, P. M. 1842. When these two entries were made, was not shown. The secretary of the company was not examined ; nor did the book of minutes appear at any of the examinations of witnesses ; nor does the witness Brown say, that he saw the book of minutes and these entries in it, at or before the execution of the bond and mortgage. It is obvious that if may have been supposed by some person, at some period before the bond and mortgage were assigned, that such a state of the minutes as would appear to show an adjournment from a former meeting at which three directors, ■ besides Stebbins, were present, might put the question of the validity of the bond and mortgage on a better footing, than if it stood simply on the resolution appearing in the minutes of the meeting of the 10th, the heading of which does not state how many or who were present. A careful examination of the minutes, compared with testimony, has satisfied me, that the entry stating an adjournment from the 5th to the 10th, is not a correct entry ; and that it was made, not on the 5th of January, but at some subsequent time.- [The reasons for this conclusion are here stated.]
There may 'have been another reason for introducing this- *171 entry of adjournment from the 5th to the 10th. The heading of the minutes of the meeting of the 5th, is, “At a meeting of the board of directors of the company, at the house of John 'I.'orbert. innkeeper, pursuant to notice duly given to said directors respectively, the following persons were presentnaming Gaston, Yan Renselaer, Stebbins and Packer. It may have been supposed that the entry of an adjournment from the 5th to the 10th, would have the effect of making the .meeting of the 10th appear to be a meeting on clue notice. Whether this would he so, if all the directors were not present at the first meeting, is at least doubtful, in reference to business of an extraordinary character. The entry of an adjournment was made for some purpose, and was thought necessary or proper by some person, for some purpose ; but, from the appearance of the minutes, in connexion with the testimony, I think it was not made in accordance with the fact.
As to the resolution appearing on the minutes as of January 5th, 1842, directing the president to execute the bond and mortgage and affix thereto a common seal, the book of minutes furnishes no evidence to he relied upon, that it was passed at a, meeting on duo notice, at which three directors, besides Stebbins, were present—no evidence that it was passed by a legal board. And Yan Renselaer, who from the minutes would appear to have been present, says he has no recollection that at a meeting of the board an order was made directing a mortgage to he given to Stebbins. He says ho knows a mortgage was given, sanctioned by the board, and that he consented to it. This does not prove that he was present at the meeting which, he says, sanctioned it; and the consent of an individual director, not sitting in a legal board, is nugatory. If Van Renselaer was not present, then it could only have been sanctioned at a meeting of three, of whom Stebbins was one, for it is shown that Ibbotson was absent, out of the state.
If I am right in the conclusion to which I have come from an examination of the book of minutes and of the testimony, then the resolution appearing on the minutes as of January 5th, 1842, directing a bond and mortgage to be given to Steffi bins, depends for its efficacy, on a simple entry of a resolution, on minutes of very suspicious appearance, without any *172 .statement 'of a meeting of the board, without stating who were present, or the presence of any one, without any proof of notice of the meeting, and without proof aliunde that a board was present, and against the testimony of one of the directors that he has no recollection of such a resolution being passed at any meeting of the board, and against the presumption of the absence of another of the five directors, Ibbotson, arising from his non-residence. It appears to me that it would be going too far, to sajr that such an entry as that of this resolution of January 5th, is binding on the corporation.
Again, this was a business of an extraordinary character, the mortgaging the real estate of the corporation. Is an entry in the minutes, even if free from suspicion, that the meeting was held on due notice, sufficient evidence of it, if it appears, as it does here, that all the directors did not attend? Indeed, the true reading of the heading under which this was introduced, is, that it was on due notice to the directors who attended.
On the question, then, whether this bond and mortgage were legally given, so as to bind the corporation, there are several matters about .which I am not satisfied. I am not satisfied that under this charter, the concurrence of less than three affirmative voices out of the five directors, will bind; nor that the meetings which passed the .resolutions of January 5th, and "January 10th, 1842, were duly assembled; nor that three of the directors besides Stebbins voted for either of them.; nor that Stebbins, with two other directors, could constitute a board to direct a mortgage to be given to him. But as to these matters, I do not give a decided opinion. My view of the case on another ground of defence, has led me to a conclusion satisfactory to my mind, and I shall decide the cause on that ground.
The ground of defence now to be examined, is, that the mortgage was giyen to Stebbins as the agent .of the .company, to enable him to raise money for the company, on his representation to the directors that the money needed by the company could not be raised on the bond and mortgage of the company direct to any lender; or after failure so to raise money, and on his representation that he could raise it on a bond and mortgage of the company executed to him, by an assignment of it to some person, allowing the lender a premium or greater rate of inter *173 est than the legal interest, and that this was the only way in which the money could be raised: and that the mortgage was given under such circumstances (which it is contended are shown in evidence) that to enforce it against the company would be a fraud on the directors and the company ; in short, that as a mortgage of the company to be used by Stebbins against them, it was procured by fraud.
If these papers were obtained for the purpose of raising money for the company, and are fraudulently attempted to be used by the party obtaining them, as securities given to him for his own benefit, it will be considered that when he obtained them, and in using the means of obtaining them, he entertained the design of using them for liis own benefit, and that therefore he obtained them fraudulently.
I am of opinion that the bond and mortgage were not good iu the hands of Stebbins against the .company. He acted as the general and financial agent of the company. (It is not material to the present purpose, to inquire whether such an agent can be legally appointed, and a director can be such an agent.) On the 1st of January, 1841, a resolution appears on the minutes of a meeting at which Gaston, Van Renselaer, Stebbins and Packer are stated to have been present, authorizing Stebbins to negotiate a loan of any sum not exceeding $5000, and to give a, bond of the company and a mortgage on their factory and the lot on which it stands, to secure the payment thereof. On the 23d of August, 1841, a resolution appears, without any heading of a meeting or statement who were present, that J. N. Stebbins, agent of the Somerville Manufacturing Company, is authorized to loan money from the State Bank at Elizabethtown, from time to time, by notes or drafts, provided the liability of said company shall not at any time exceed $1500. On the 5th of January, 1842, two resolutions appear, one, a resolution that a bond and mortgage be executed to the State Bank at Elizabeth, to secure the personal liability of the president and directors of the Somerville Manufacturing Company to said Bank, for money loaned or to be loaned, the sum not to exceed $1500; the other, a resolution “that the president is hereby authorized and directed to execute a bond and mortgage to Jared N. Stebbins, for $9600. payable in three *174 years from date, tire .interest to .be paid annually and every year.”
Each of these resolutions, except the last, shows on its face the object for which the securities mentioned in it are to be given. The last simply authorizes and directs the president to execute a bond and mortgage to Jared N. Stebbins for $9600, without stating the reason or the object or .purpose why or for which it was to be given.
The first resolution is, that Stebbins negotiate a loan of $5000, on the bond and mortgage of the company to the lender. This mode of borrowing .money failed. Through the course of the year, other means were used for borrowing money, with some success, but not to the amount required ; and on the 5th of January, 1842, the last of the said resolutions was adopted, (supposing for this part of the case .that it was legally adopted,) directing a bond and mortgage to be given to Stebbins, without saying for what reason or consideration ; and Stebbins now claims that this mortgage is a valid security in his hands, and seeks to enforce it against the company. This would be the state of the matter as between Stebfoins and the company.
Three of the persons who were directors at the time of the ■transaction, have been sworn in the cause—two of them called on the part of the defendants, and the other on the part of the complainant—-in reference to the object of giving the mortgage, and the manner and means in and by which those of the directors who voted for it, were induced to do so. [The testimony on this part of the case is here examined.]
The closing counsel for the complainant contended, that the amount of the testimony was this; that Stebbins was to raise the money on the mortgage given to him for his debt, and to appropriate some $2000 or $3000 of it to pay the debts of the company, and to make advances as one interested in the company. This explanation is hardly satisfactory. The conclusion I have reached is, that as a bond and mortgage to be used by Stebbins against the company, they were procured by fraud.
The next question is, will the bond and mortgage be good in the hands of Van Hook, if he be a bona fide holder? The *175 case of Barrow v. Bispham, in the supreme court of this state, G Halst. 11.9, decides, that the assignee of a bond takes it subject to all the equities which existed against it in the hands of the obligee, and that fraud in the obligee in obtaining it is a good defence against the assignee, though he purchased it for a valuable consideration and without notice of the fraud.
This principle may not be fully applicable to this case. These securities, (assuming now that they were legally executed,) were executed to Stebbins, the agent, to enable him to raise money for the company by an assignment of them. If the agent had used them in the manner contemplated, and obtained the money, the company would be liable on them, though the agent failed to apply the money to the use of the company. Can securities made to an agent to be by him assigned to raise money for the company, be resisted, in the hands of a bona fide assignee, on the ground that he assigned them for real estate, for purposes of his own ? I am inclined to think that the rule in 6 Halst. should not be applied in this court, in a case like this, against a purchaser in good faith and without notice. Is the complainant such an assignee 1
First, as to good faith, irrespective of notice. In this inquiry it must be borne in mind, that Stebbins, in the measures taken during the progress of what he called the negotiation, was acting with the knowledge that the mortgage was executed to him' to raise money for the company, and yet, with the design, as-proved by the result, of making it available for his own benefit, I think it cannot, be doubted that he was acting under the conviction that it would be resisted, if attempted to be used by him against the company as a mortgage for his own benefit. His object, then, would be to get it into the hands of one who-should claim as assignee; and to get as much as he could from the' officers of the company to strengthen the claim of the assignee, I think it will be manifest, that the whole course of proceeding1 connected with the assignment, is consistent only with this design on the part of Stebbins, and is inconsistent with the idea that the complainant was a real purchaser in good faith. Noman, acting with sincerity and good faith, would have been satisfied to buy this mortgage and pay for it on the credit of the papers which Stebbins- procured from the president and secretary *176 of the company. And' I am clearly of opinion that he never did buy and pay for this mortgage—a' mortgage on a manufacturing site without water power, and to which a lease of water had been refused. The certificates, and suppletory resolutions, of copies of what purported to be resolutions, were procured by Stebbins, and at his instance, with a view to aid the mortgage in the hands' of an assignee for his own benefit.
A certificate of John I. Gaston, and another writing signed by him which it is difficult to characterize, and a copy of what purports to be a resolution' of June 28th, 1842, are exhibited ori the part of the complainant. The certificate is dated June 28th, 1842, and is signed John-1. Gaston, without addition, and purports to certify, that a bond and mortgage for $¡9600, was given and executed by him to J. N. Stebbins, as president of the Somerville Manufacturing Company, by order of the board of directors, as said amount was due him as agent of the company, and that he knew of nothing that could be brought against said claim in abatement or in any way destroy its validity.
The resolution of June 28t'h, 1842, of which a copy is exhibited, signed J. A. Gaston, secretary, is as follows:—
“At a meeting held June 28th, 1842, the following preamble and resolution were adopted.- Whereas a certain bond and mortgage, given by the Somerville Manufacturing Company to Jared N. Stebbins, for the sum of $¡9600, bearing date the 10th day of January, 1842, has been this day submitted to the inspection of this board; and the same having been considered and examined: It is resolved, that the said bond and mortgage is a legal and subsisting liability of the said company, and that they have no defence to make to the same, either in law or equity.
“June 28th, 1842. J. A. Gaston, secretary.”
A letter had been written by Stebbins to Gaston, from New-York, dated March 29th,- 1842, in which he says, he finds obstacles in the way of negotiation; that he wants a certificate from Gaston, as president, that the bond and mortgage is a valid one, given him for the amount due him. On the 28th of June, 1842, he receives the foregoing paper, signed by John I. Gaston, not as president, and stating, not “ that the bond and mortgage were' valid, given him for the amount due him,” as requested by the letter, but, that they were given and executed *177 to Stebbins, “ as said «amount was due said Stebbius m agent of the company.”
If the mortgage bad been given to Stebbins for an amount due him, why was it that Gaston not only omits to sign as president, but falls short of saying what the letter asks ? The truth of Gaston’s deposition, that ho gave the certificate for the same purpose the bond and mortgage were given for—to enable him (Stebbius) to make the loan---to aid him in making the loan; and that he never gave Stebbins a certificate that the company had given him the bond and mortgage for any debt due him from the company, io confirmed by the language of this so-called certificate. Gaston was willing to say as much as he could in aid of that object: but the restraint of the language of the certificate is manifest. The design of Stebbins, before spoken of, is obvious from the language of the letter. In view of the fact, as it appears by the result, that Stebbins was about putting these papers in the hands of an assignee, for a deed to his son of property in New-York, it is plain that he was availing himself of the pressure on the company for mo - ney, to procure from the president what he cupposed might give effect to the mortgage in the hands of an assignee. But Gas-ton, even under the pressing necessities of the company, would not give the certificate asked, though acting under the belief that Stebbins was honestly endeavoring to negotiate the mortgage for money for the company. This certificate is exhibited by the complainant to show good faith in him in taking the assignment. (It will be recollected that the negotiation, as Stebbins called it, which ended in the alleged trade for the New-"York property', commenced some months before the 28th of June.) Did the complainant require the certificate Stebbins wrote for 1 If he did not, then its procurement by Stebbins, and its production now by the complainant, are consistent only with the design of Stebbins before stated and with a want of good faith in the complainant. If it was at his suggestion that Stebbins wrote on the 29th of March, asking the certificate mentioned in that letter, would what Stebbins, after the lapse of three months, procured, have been satisfactory to one proposing in good faith to buy the mortgage ?- Its language was short of what the letter asked, and *178 it was not signed by Gaston as president; and if what was requested to be certified was true, Gaston could have had no hesitation in giving the certificate in the language of the letter and signing.it- as- president; and besides; the certificate, if given as required, would be no evidence whatever of the fact it, purported to certify. The only object that could have been had in procuring it- was, that it might furnish some evidence of good faith in the complainant in taking the assignment. The resort to such-means, in view of the inquiries he put and of others he failed to put to Gaston, when Stebbins-took him out to Somerville, are little calculated to show his good faith; or to satisfy us that a man-of the business- capacity of the complainant would or did part with his property, and put it out of his control, on the faith of such a paper.
But this letter of Stebbins went further; and said, “ The best way is, to copy the resolution on the books, provided there is nothing else in the said resolution.” An entry of a resolution appears on1 the minutes, of the same date with the said certificate, (June 28th, 1842:) it is the entry., a copy of which, signed J'. A. Gaston, secretary, is before given. This entry and the copy of it signed by the secretary, and the above certificate of Gaston; were made for the purpose of removing the obstacles whieh Stebbins said he found in the way of negotiation. Stebbins wanted a resolution “that the bond and mortgage is a valid one, given-him for the amount due him,” “provided there is-nothing else in said resolution ;” and he wanted the certificate of the president to- -the same effect.
To show Stebbins’s idea of the way in which things might be done, and the boldness with which he availed himself of the pressure on the company for money, in order to get'from Gas-ton something, which he hoped might make the mortgage good in the hands of an assignee, we have only to- ask how, according to kis-notions;. such, a resolution and certificate-were to be made. Ibbotson- was absent ;■ Van Renselaer- lived out of the state, a-nd he testifies that- “ he knew nothing of the resolutions of the board, or the certificates of the president, in relation to the mortgage, at the time of the transfer to Van Hook, or of the machinery by which said resolutions and certificates were *179 obtained which resulted in the negotiation of the mortgage, he not having been present at any of the meetings of the board when the resolutions were passed and the certificates were given and Stebbins was in New-York when be wrote the letter. This left but two of the directors, Gaston and Packer, to comply with the requirements of his letter.
How it is that this certificate and entry of a resolution and copy of it wrere not made til! June 28th, does not appear. Three months elapsed before the certificate, such as it was, was given. I suppose the truth to be, that Stebbins’s immediate presence and aid were necessary to procure them; and inasmuch as Yan Hook could not make a deed for the New-York property till after he should get a deed for it under his foreclosure suit, and Stebbins could make no arrangement with any one else to take an assignment of the mortgage, the delay worked no injury to either of them. What would be the effect of the delay on the mind of a person intending, in good faith, to buy the mortgage, is another matter. But the entry of this resolution was at length made, and the copy .of if and the certificate of Gaston, as above given, were procured. The resolution w7as either caused to be entered by Gaston alone, or by Stebbins and Gaston, or at best at a meeting composed of Gaston, Stebbins and Packer. Packer says, be cannot say whether lie was present or not. And if he w7as, it would not be a competent board for the purpose, for the reason, that if it was, then a mortgage to one of five directors might be declared to be a legal and subsisting liability of the company by a vote of that director and one other. But this entry is, in its terms, still less -a .compliance with the request than the certificate of Gaston; and as -to the form of it, it is headed thus: “At a meeting held June 28th, 1842, the following preamble and resolution were passed.” Who were present at the meeting? where was it held ? by whom was the resolution passed ? It cannot be that the complainant in good faith bought the mortgage on the credit of the papers .exhibited by him in the cause.
Another paper is exhibited on the part of the complainant: it is the one which I have before said it is difficult to characterize ; a writing at the foot of a statement of Stebbins’s account against the company. It is in .the hand-writing of John I. Gas- *180 •ton, and reads thus:—“ The board of directors having examined the above account, do pass the same, and acknowledge a balance due J. N. Stebbins of $9638 17. Signed by order of the board, Jno. I. Gaston, president.
“ January 5th, 1842.”
What is the character of this writing ? It does not purport lo be a certified copy of a resolution; but would rather seem to •purport -to be an original resolution, or perhaps more like a certificate of Gaston that such a thing was done. When was it furnished, or sent, or given to Stebbins? There can be no •doubt it -was one of the papers sent or given to Stebbins in compliance with his request in his letter of March 29th, 1842, or •on a similar request further urged by him afterwards; and hence the singularity of its form. The date put to it is not the date at which this writing, or certificate, or whatever it may be Called, was made, but purports to be the date at which what is said in the writing to have been done, was done. The form of -this writing adds another proof that all the exhibits on the part of the complainant were got up long subsequently to the execution of the mortgage, at the instance of Stebbins, to serve bis design; and -that the nature of the transaction between Stebbins and the complainant, as it finally resulted, was different .from that of a bona fide purchase of this bond and mortgage. Does Gaston, by this writing, say, that the board passed such a resolution on the 5th of January, 1842 ? Certainly not. If such a resolution had been passed at that date, and then placed on the minutes, it cannot be imagined that such a non-descript writing as this would have been resorted to; a copy of such resolution, if it had been so passed, made in such a way as to satisfy a man proposing in good faith to buy the bond and mortgage, would have been required and made. The production of such a paper amounts to less than .nothing on the question of the good faith of the complainant. “ The board of directors, having examined,” &c. Is this the form of a resolution as it would appear on the minutes? The .very form of this waiting, instead of giving satisfaction, carries plain'and strong marks of suspicion. Who were present when any such resolution was passed ? who constituted, or pretended fq constitute, a board to pass it? and how were they assenv *181 bled ? was Stebbins himself one of them 1 As to these matters the writing is silent. And, what is quite as singular, Gaston, though produced as a witness in the cause on the part of the defendants, was not shown this writing by the complainant, nor asked when or where any such resolution was passed. Why Stebbins should not have the question asked is sufficiently plain, but why the complainant, if he was a bona fide assignee, having produced this paper to show his good faith, should omit to do so, I am at a loss to understand. The production of these papers, exhibited on the part of the complainant, furnishes no evidence of his good faith in this transaction: in my judgment they disprove it. If he was acting in good faith he would not have relied on writings of such a character, and produced to him by Stebbins, .the man from whom he was to take the assignment.
But it was thought best that Van Hook should seem to have made inquiries for himself, and accordingly he rides out to Somerville with Stebbins. He stops at John I. Gaston’s; does not not go to see the property. Gaston testifies, that Van Hook made no inquiry about the mortgage being given to Stebbius for a debt due to Stebbins; nor any inquiry as to the means of the company for completing the works; nor any inquiry as to the water power, or whether a lease for water could be procured ; nor, though on the spot, does he make any inquiry for the minutes, or as to the action of the board in reference to the giving of the mortgage. Gaston's testimony on this part of the case is as follows: “ Mr. Van Hook stopped at my door and told me he had come out to see about loaning Stebbins the money on the bond and mortgage. I told him we wanted about $10,000 to set the property a-going and pay the debts, and that Stebbins said that sum would do it; that 1 considered the property would he worth $20,000 when in operation.” “ I told him that if he had the money to spare, he could not put it out more safely; that we were anxious to get the money and have the works in operation. Mr. Van Hook said he could furnish the money if he was satisfied with the security, but that he did not wish to run any risk, as he had already lost some money before on loans made for other persons.” “ Van Hook made nevera! inquiries as to the value of the property.” “ I never *182 made the least intimation to him, or any other person, that the money was to be raised for the benefit of Stebbins.” “Mr. Van Hook did not inquire as to the means of the company for completing the works; but 1 told him that if we could obtain the money on the bond and mortgage, we'would be able to put the works in operation, and that then the property would be valuable.” Let it be recollected here that Van Hook claims to recover on this mortgage on the allegation that he gave a deed for real estate for it.
Again, at a meeting of the Water Power Company, said to have been in June or July, 1842, Stebbins said he could not negotiate the mortgage'without a lease of water for the use of the Somerville Manufacturing Company. He had before written to Gaston, saying, “ I have found a person who has $10,000 to loan at seven per cent, and will let me have it on the mortgage, provided the property on which it is a lien is worth $20,000; "but he objects until I get some certainty for water without any question ; he does not like any chance of a law-suit. It must he a first mortgage. This can be got along with, either by paying up the $1500, or keeping it back, as we shall hereafter agree upon.” This letter was produced on the part of the defendants. It shows the design of Stebbins. The mortgage would be of no value without a lease of water. Then iñ June or July he still presses the Water Power Company for a lease of water, saying he could not negotiate the mortgage without it, and it is refused;' and it is quite clear from the testimony, that without water the property as it then stood was of little value, compared with the sura named in the mortgage. But the effort to get the lease fails; yet this failure to procure water makes no difference to the complainant, the alleged exchange proceeds, notwithstanding, and Van Hook takes an assignment of the mortgage, not paying money, which Gaston told him they wanted, to put the -works in operation and make the property valuable and good security for the money, but making a deed of real estate to Stebbins’s son, and telling us by his witness, the land broker, that Stebbins’s son made a mortgage on that real estate to a Mr. Morgan.
Again, the conversation between Van Hook and Gaston, in which Van Hook, while this alleged trade for real property was *183 going on, told Gaston that he had come out to see about loaning the money, and that he could furnish the money if he was satisfied with the security, and in which Gaston told him what is before stated to have been told him by Gaston in that conversation, of what the money was wanted for and how it was to be applied, shows, in my judgment, to the conscience of a court of equity, both snggestio falsi and suppressio veri on the part of Yan Hook.
■ Can it be believed that a- man acting in good íáitb, and really intending to give real estate for this mortgage, would have made such a representation to Gaston, or, on receiving the information Gaston gave him, would have omitted to inform Gas-ton that Stebbins proposed to trade the mortgage for real estate in New-York? Can there be a doubt that if he had done so, as he most assuredly was required in honesty to do, the company would have taken immediate means to- protect themselves-against the faithlessness and designs of Stebbins?
This part of the case is consistent with all the features of the transaction, as well those before examined as the subsequent parts of it; aad, instead of showing good faith in Yan Hook, it makes him a party to the fraud of Stebbins. I cannot understand how a man acting in good faith could proceed with the trade after this;. but I think I can understand how two men, determining to proceed after this, should proceed as they did; that is, have the deed from Yan Hook for the New-York property made to Stebbins’s son, (who, it will be recollected it is testified, when a subpoena to appear as a witness was handed to him, read it and said he did not know what it was; that he did not know any thing about it; that he did not know Yan Hook;) and have Stebbins’s son make a mortgage to one John B. Morgan. Again I ask, could a-man ingeod faith, on the production of such papers, and after the information he got from Gaston, have bought and paid for this mortgage? It requires stronger faith in the complainant’s simplicity than I have, to believe it.
The closing scene of the transaction is just such as was to be looked for. No evidence was given to show when the assignment to the complainant, or the deed to the son, or the mortgage made by the son, was delivered; but it appears tha& *184 an assignment of the bond and mortgage was left, by Stebbins, in the office of the' clerk of Somerset, and recorded after the 9th of August, 1842 j that on the 8th of September, 1842, the report of the master ih chancery in New-York, of the sale of the New-York property to Yan Hook, was confirmed unless cause to’ the contrary should be shown in eight days; and that the deed for that property, from the master in chancery in New-York to Yan Hook, was recorded on the 19th of September, 1842; and the mortgage from Stebbins’s son to Morgan is dated August 23d, 1842.
The complainant’s' witness, Jones, would seem to ask as to suppose that young Mr. Stebbins, under these circumstances, borrowed $8000 on the mortgage executed by him of this New-York property, dated August 23d. It would have been a relief if Mr. Morgan, or somebody acquainted with this part of the transaction, had been examined; to tell us something about this mortgage, when it was delivered, and to whom, and what given for. If it was given for the benefit of Jared N. Stebbins, and had no connexion with the transactions between Yan Hook and him, and Yan Hook actually parted with the New-York property and has no control over it by means of this mortgage to Morgan, it would have been very easy for J. N. Stebbins or Yan Hook to produce evidence to satisfy us of this; and Stebbins, as well as Yan Hook, wa3 interested to do so. Instead of this, and though Yan Hook,- under the pressure of the case in another view of it, puts forward this mortgage from Stebbins’s son, no account of it is given, except that Jones, a witness produced by the complainant, and who produced a certified copy of the mortgage, says, that' he had seen it in New-York the morning of the day of his examination, in the hands of one Edward P. Clark, and that “ he could not get the original out of the office; they refused to let him have it.”
More light might be thrown upon the subject by examining Jones’s testimony in connexion with a fact of which he did not speak, and which was not alluded to by the counsel on either side, for the reason, I presume, that the voluminous record of the proceedings in the chancery suit in New-York was not read by either of them; and that is, the fact that some time before the sale of the New-York property by the sheriff to Yan Hook, *185 Bowen, against whom the decree in that case was made, had become insolvent and made an assignment for the benefit of his creditors. But I forbear to say more of this matter, than that we hear nothing of any assignment of that decree either to J. "N. Stebbins or to his son. In view of this fact, this part of the case is to be a^ded to the pretences.
It appears to me, that under the proofs in the cause, irrespective of notice, the complainant is not entitled to be considered a bona fide purchaser, and, therefore, is not entitled to the application of equitable considerations to relieve him from the rule in Barrow v. Bispham.
I am of opinion, further, that the information he received from the president of the company, was sufficient notice to take from him the character of a bona fide purchaser without notice, if without that information he could have been considered such.
The bill will be dismissed'.
Order' accordingly.